JM:KTC:JEG
F.#2008R00780

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JUN 0 3 2009 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

THOMAS KONTOGIANNIS,
JOHN MICHAEL,
ELIAS APERGIS,
STEVEN MARTINI,
NADIA KONSTANTINADOU,
STEFAN DELIGIANNIS,
TED DOUMAZIOS,
EDWARD HOGAN, and
JONATHAN RUBIN,

          Defendants.

- - - - - - - - - - - - - -X

I N D I C T M E N T

CR. 09 360

(T. 18, U.S.C., §§ 982(a)(1) and (a)(2), 1343, 1344, 1349, 1956(a)(1)(A)(i), 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p))

MATSUMOTO, J.

J. ORENSTEIN, M.J.

THE GRAND JURY CHARGES:

### INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    <u>The Defendants and Relevant Companies</u>

      1.    The defendant THOMAS KONTOGIANNIS was a real estate developer who bought, developed and sold properties located primarily in Brooklyn and Queens, New York.

      2.    KONTOGIANNIS controlled several businesses, including Interamerican Mortgage Corporation, which later became CIP Mortgage Corporation (collectively, "Interamerican/CIP"), Coastal Capital ("Coastal") and Clearview Title Abstract ("Clearview"). Interamerican/CIP and Coastal were mortgage

lenders. Clearview was a title insurance agent. KONTOGIANNIS placed family members or other individuals beholden to him in charge of these entities.

3. Loring Estates was a vacant tract of land located in the East New York section of Brooklyn. Between October 2002 and April 2003, KONTOGIANNIS acquired this land through Loring Estates, LLC ("Loring"), an entity he controlled. The City of New York issued building permits for multi-unit housing at Loring Estates in 2002. Construction has yet to be completed on all units.

4. Edgewater Development was a vacant tract of land located in the College Point section of Queens. In June 2001, KONTOGIANNIS acquired this land through Edgewater Development, Inc. ("Edgewater"), an entity he controlled. The City of New York issued building permits for multi-unit housing at Edgewater in 2001. Construction has yet to be completed on all units.

5. The defendant JOHN MICHAEL was KONTOGIANNIS' nephew. MICHAEL was the president of Coastal.

6. The defendant ELIAS APERGIS was KONTOGIANNIS' son-in-law. APERGIS was the president of Bond & Walsh Construction Company, Loring and Edgewater.

7. The defendant STEVEN MARTINI was a real estate appraiser licensed by the State of New York.

8. The defendant TED DOUMAZIOS was the President of Clearview.

9. The defendant STEFAN DELIGIANNIS was an employee of Interamerican/CIP.

10. The defendant NADIA KONSTANTINIDOU was an employee of Interamerican/CIP and later managed numerous entities and bank accounts on behalf of KONTOGIANNIS.

11. The defendant JONATHAN RUBIN worked as a real estate developer and engineer on construction projects for KONTOGIANNIS-controlled entities, including Loring and Edgewater. Among other things, RUBIN applied for permits and work orders from the City of New York.

12. The defendant EDWARD HOGAN was the architect on construction projects for KONTOGIANNIS-controlled entities, including Loring and Edgewater. Among other things, HOGAN submitted maps, plans and building and address applications to the City of New York.

13. KONTOGIANNIS controlled numerous other bank accounts and entities, including Olympicorp International, LLC ("Olympicorp"), Parkview Financial, Inc. ("Parkview") and Brookville Plaza Management, Inc. ("Brookville").

14. Washington Mutual Bank, N.A. ("WAMU") was a financial institution headquarted in Seattle, Washington, the

deposits of which were insured by the Federal Deposit Insurance Corporation.

15. DLJ Mortgage Capital, Inc. ("DLJ") was a wholly-owned subsidiary of Credit Suisse U.S.A., Inc. Among other things, DLJ purchased loans from other lending institutions.

II. <u>The Fraudulent Scheme</u>

16. From in or about March 2003 until in or about September 2007, the defendants, together with others, engaged in a scheme to defraud banks and other investors in mortgages by obtaining mortgage loans by fraudulent means in the names of straw buyers.

17. The defendants, together with others, prepared fraudulent documents to facilitate the sales of the mortgage loans into the secondary market, including fraudulent mortgage applications, fraudulent appraisals, and fraudulent title searches. The defendants used some of the properties securing the loans as first-lien security for other loans, meaning the defendants led lenders to believe that their loans were in the first position in the event of default. The lender, either Interamerican/CIP or Coastal, then sold the mortgage loans to investors in the secondary market, often before construction on the properties securing the loans was completed. To prevent the banks from learning that the conspirators had used many of the properties as security for multiple loans, KONTOGIANNIS directed

KONSTANTINADOU to make monthly mortgage payments so that the loans would not become delinquent.

18. KONTOGIANNIS used the funds obtained from the sales of the loans to investors in the secondary market to finance construction on the Loring and Edgewater homes, finance construction on other projects, make the monthly mortgage payments for all the loans, and enrich himself and his family.

A. The Fraudulent Loan Applications

19. KONTOGIANNIS recruited straw buyers to pose as purchasers of properties owned by a KONTOGIANNIS-controlled entity such as Loring or Edgewater. KONTOGIANNIS and KONSTANTINADOU selected the property for which the mortgage would apply. The straw buyers included members of KONTOGIANNIS' family; high-ranking members of his organizations, such as DELIGIANNIS, APERGIS, RUBIN and HOGAN; and construction workers and security guards employed by KONTOGIANNIS. KONTOGIANNIS told the straw buyers that he would make monthly mortgage payments and that, if anything went wrong, the house would revert to their ownership. KONTOGIANNIS also told straw buyers that this endeavor would allow them to build their credit. On some occasions, the straw buyers were unaware that the conspirators were using their personal information to apply for a loan. In at least one instance, the conspirators told a straw buyer the documents he was signing were merely to check his credit.

20. KONTOGIANNIS, DELIGIANNIS and others processed the straw buyers' applications through Interamerican/CIP and Coastal. Among the defendants and other conspirators, these loans were known as "Tommy Loans" or "Tommy Files."

21. KONTOGIANNIS instructed DELIGIANNIS or another Interamerican/CIP or Coastal employee to create the appearance that the straw buyers qualified for a loan. Many of the straw buyers lacked sufficient income or assets to qualify for a loan in the amount desired. As a result, DELIGIANNIS or another Interamerican/CIP or Coastal employee would falsify various documents, including employment information and bank statements, in an effort to make the straw borrower appear creditworthy. Eventually, Coastal allowed prospective borrowers to state their income, employment and assets on the loan applications without providing supporting documentation. This change to "no doc" or "stated income" loans relieved the conspirators of the need to create fraudulent employment, income and asset verification documents.

B. The Fraudulent Supporting Documents

22. DOUMAZIOS, through Clearview, provided title reports to Interamerican/CIP or Coastal purportedly to demonstrate that Loring or Edgewater, as the selling entity, had clean title to the property to convey to the buyer. These title reports did not disclose that the properties had pre-existing

liens from the other loans the conspirators had obtained. Many of the mortgages were never recorded, thereby enabling the conspirators to mortgage the same property repeatedly.

23. The conspirators inserted checks made payable to Clearview for title insurance into the lenders' loan files to create the appearance that the lenders' interest in the properties securing the loans was protected by title insurance. In most cases, those checks were never cashed, and no title insurance policies were ever issued.

24. MARTINI also prepared fraudulent appraisal reports for the subject properties. The subject properties in many of the transactions were not yet built and, in other transactions, never existed. Nonetheless, MARTINI included in the appraisal reports photographs of fully constructed homes depicting finished interiors and appliances. In some instances, MARTINI placed the names of other appraisers on the reports he prepared without their knowledge or permission.

C. The Fraudulent Down Payments

25. While the closing documentation for the loans showed the borrowers had made down payments, the borrowers did not make any down payments.

D. The Fraudulent Address Shift

26. In an effort to obtain multiple mortgage loans secured by the same properties located at Loring Estates and to

conceal their activities, the defendants KONTOGIANNIS and
KONSTANTINADOU created fictitious property addresses. For
example, if the property located in Loring Estates at 440 Amber
Avenue, East New York, Brooklyn had one or two mortgage loans on
it already, KONTOGIANNIS and KONSTANTINADOU changed the address
to 149-18 78th Street in adjacent Howard Beach, Queens. As with
the East New York addresses, MARTINI supplied fraudulent
appraisals for the Howard Beach addresses. APERGIS signed
fraudulent closing documents to facilitate the multiple sales of
these homes. DOUMAZIOS provided title reports demonstrating that
Loring had clean title to convey on each property, despite the
fact that these new addresses did not exist.

E. Sales Of Loans Into The Secondary Market

27. At KONTOGIANNIS' and MICHAEL's direction,
Interamerican/CIP and Coastal sold over $92 million of fraudulent
loans to investors in the secondary market. These loans were
purchased by WAMU, DLJ and other investors. In connection with
these transactions, the fraudulent loan files, which included all
of the fraudulent documents discussed herein, were provided to
the investors.

28. In an effort to prevent investors from learning of
the fraud, KONTOGIANNIS directed KONSTANTINADOU and others to
engage in a Ponzi-like scheme in which they made monthly mortgage
payments on all outstanding mortgage loans the conspirators sold

to the investors by using the proceeds of the sales of other fraudulent loans. KONSTANTINADOU and others continued to make these mortgage payments through Olympicorp, Parkview and Brookville until September 2007.

## COUNT ONE
(Conspiracy to Commit Bank Fraud and Wire Fraud)

29. The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

30. In or about and between March 2003 and September 2007, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants THOMAS KONTOGIANNIS, JOHN MICHAEL, ELIAS APERGIS, STEVEN MARTINI, NADIA KONSTANTINADOU, STEFAN DELIGIANNIS, TED DOUMAZIOS, EDWARD HOGAN and JONATHAN RUBIN, together with others, did knowingly and intentionally conspire to:

(a) execute a scheme and artifice to defraud WAMU, and to obtain moneys, funds, credits and other property owned by and under the custody and control of WAMU by means of materially false and fraudulent pretenses, representations and promises, contrary to Title 18, United States Code, Section 1344; and

(b) devise a scheme and artifice to defraud WAMU and DLJ, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, all

affecting a financial institution, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, contrary to Section 1343 of Title 18 of the United States Code.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS TWO THROUGH FIVE
(Bank Fraud)

31. The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

32. In or about and between March 2003 and September 2007, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants listed below, together with others, did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud WAMU, and to obtain moneys, funds, credits and other property owned by and under the custody and control of WAMU, by means of materially false and fraudulent pretenses, representations and promises, as set forth below for each count:

| Count | Defendants | Property Securing Loan | Date of Loan | Amount of Loan |
|---|---|---|---|---|
| TWO | KONTOGIANNIS, KONSTANTINADOU, DELIGIANNIS and MARTINI | 1444 Loring Ave., Brooklyn, NY | 9/5/2003 | $495,000 |
| THREE | KONTOGIANNIS, APERGIS and DOUMAZIOS | 1444 Loring Ave., Brooklyn, NY | 9/7/2005 | $475,000 |
| FOUR | KONTOGIANNIS, APERGIS, KONSTANTINADOU, DELIGIANNIS and MARTINI | 114-23 Taipei Ct., College Point, NY | 1/21/2004 | $516,000 |
| FIVE | KONTOGIANNIS, APERGIS and MARTINI | 114-23 Taipei Ct., College Point, NY | 4/9/2004 | $562,500 |

(Title 18, United States Code, Sections 1344, 2 and 3551 et seq.)

## COUNT SIX
(Wire Fraud)

33. The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

34. In or about and between March 2003 and September 2007, both dates being approximate and inclusive, within the Southern District of New York and elsewhere, the defendants THOMAS KONTOGIANNIS, JOHN MICHAEL, ELIAS APERGIS, STEVEN MARTINI, NADIA KONSTANTINADOU, STEFAN DELIGIANNIS, TED DOUMAZIOS, EDWARD HOGAN and JONATHAN RUBIN, together with others, did knowingly and intentionally devise a scheme and artifice to defraud DLJ, and to

obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice did transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, specifically a wire transfer of $1,207,795.81 from the account of DLJ at JP Morgan/Chase Bank, New York, New York, to the account of Coastal Capital Corp. at U.S. Bank, Portland Oregon, which constituted the proceeds of fraudulent mortgage loans, and which related to purported purchases of 149-11 76th Street, Howard Beach, New York and 149-22 78th Street, Howard Beach, New York.

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNT SEVEN
(Money Laundering Conspiracy)

35. The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

36. In or about and between March 2003 and September 2007, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants THOMAS KONTOGIANNIS and NADIA KONSTANTINADOU, together with others, did knowingly and intentionally conspire to conduct financial transactions affecting interstate and foreign commerce,

specifically the delivery of checks, which in fact involved the proceeds of bank fraud, contrary to Title 18, United States Code, Section 1344, and wire fraud, contrary to Title 18, United States Code, Section 1343, while knowing that the property represented the proceeds of some form of unlawful activity and with the intent to promote the carrying on of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT EIGHT
(Money Laundering)

37. The allegations contained in paragraphs 1 through 28 are realleged and incorporated as if fully set forth in this paragraph.

38. In or about and between March 2003 and September 2007, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants THOMAS KONTOGIANNIS and NADIA KONSTANTINADOU, together with others, did knowingly and intentionally conduct financial transactions affecting interstate and foreign commerce, specifically the delivery of checks, which in fact involved the proceeds of bank fraud, contrary to Title 18, United States Code, Section 1344, and wire fraud, contrary to Title 18, United States Code, Section 1343, while knowing that the property represented the proceeds of

some form of unlawful activity and with the intent to promote the carrying on of the specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(1)(A)(i), 2 and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION FOR
### COUNTS ONE THROUGH SIX

39. The United States hereby gives notice to the defendants charged in Counts One through Six that, upon their conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(2), which requires any person convicted of any such offenses to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, including but not limited to: (a) a money judgment in a sum of money in U.S. Currency in an amount to be determined at trial equal to any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, for which the defendants are jointly and severally liable; (b) all right, title, and interest in the real property and premises known as 4302 Westshore Avenue (also known as the Westshore 480 Development), Brooklyn, New York; and (c) all right, title, and interest in the real property and premises known as 3301 Atlantic Avenue, Brooklyn, New York.

40. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

14

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of such defendants up to the value of the forfeitable property described in this forfeiture allegation, including but not limited to the following: (a) all right, title, and interest in the real property and premises known as 133-33 Brookville Boulevard (also known as 1 Cross Island Plaza), Rosedale, New York 11422; and (b) all right, title, and interest in the real property and premises known as One Plaza Road, Greenvale, New York.

(Title 18, United States Code, Section 982(a)(2); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION FOR COUNTS SEVEN THROUGH EIGHT

41. The United States hereby gives notice to the defendants charged in Counts Seven through Eight that, upon their conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), of all property involved in each offense of conviction in violation of Title 18, United States Code, Section 1956, or conspiracy to commit such offense, and all property traceable to such property, including but not limited to: (a) a money judgment in a sum of U.S. Currency in an amount to be determined at trial equal to all property involved in each offense of conviction in violation of Title 18, United States Code, Section 1956, or conspiracy to commit such offense, and all property traceable to such property, for which the defendants are jointly and severally liable; (b) all right, title, and interest in the real property and premises known as 133-33 Brookville Boulevard (also known as 1 Cross Island Plaza), Rosedale, New York 11422; and (c) all right, title, and interest in the real property and premises known as One Plaza Road, Greenvale, New York.

42. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

   (a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of such defendants up to the value of the forfeitable property described in this forfeiture allegation, including but not limited to the following: (a) all right, title, and interest in the real property and premises known as 4302 Westshore Avenue (also known as the Westshore 480 Development),

Brooklyn, New York; and (b) all right, title, and interest in the real property and premises known as 3301 Atlantic Avenue, Brooklyn, New York.

(Title 18, United States Code, Section 982(a)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
BENTON J. CAMPBELL
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

JM:KTC:JEG
F.#2008R00780
FORM DBD-34
JUN. 85

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT of NEW YORK

### THE UNITED STATES OF AMERICA

THOMAS KONTOGIANNIS, JOHN MICHAEL,
ELIAS APERGIS, STEVEN MARTINI,
NADIA KONSTANTINADOU, STEFAN DELIGIANNIS,
TED DOUMAZIOS, EDWARD HOGAN, and JONATHAN RUBIN,
Defendants.

## INDICTMENT

(T. 18, U.S.C., §§ 982(a)(1) and (a)(2), 1343, 1344, 1349, 1956(a)(1)(A)(i), 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p))

A true bill.

_____ Foreman

Filed in open court this _____ day,

of _____ A.D. 20 ____

_____ Clerk

Bail, $ _____

*AUSA Jonathan E. Green, (718) 254-6297*